UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

LAKISHA M. BRIDGES

        Plaintiff,

    v.                           Case No.: 2:23-cv-959

CITY OF MILWAUKEE          **JURY TRIAL DEMANDED**

        Defendant.

## **COMPLAINT**

### **NATURE OF ACTION**

1.      This is an action under Title I of the Americans with Disabilities Act of 1990 (the "ADA") and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Lakisha M. Bridges ("Ms. Bridges" or "Plaintiff"), a qualified individual with a disability, who was adversely affected by such practices. Plaintiff alleges that Defendant, City of Milwaukee ("City" or "Defendant"), violated the ADA by failing to provide reasonable accommodations which would have permitted Ms. Bridges to perform the essential functions of her job at the requisite level, by retaliating against her for complaining about disability discrimination in the workplace, and by constructively terminating her employment on the basis of her disabilities.

### **JURISDICTION & VENUE**

2.      This court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under Title I of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 et seq.

1

3.     The unlawful employment practices of which Plaintiff complains occurred within the Eastern District of Wisconsin and therefore venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

4.     Plaintiff, Lakisha M. Bridges, is a female resident of the State of Arizona, with a post office address of 875 W. Pecos Road, Apt. 2066, Chandler, AZ 85255.

5.     Ms. Bridges was employed by the City from April 20, 2009, when she was hired by City's Treasurer's Office. She was transferred to the Department of Neighborhood Services ("DNS") on December 27, 2009, and was promoted to DNS Administrative Services Supervisor of the Property Registration Section on September 28, 2014.

6.     From January 2020 through July 2021, Ms. Bridges' direct supervisor was Tanzarla Rome, DNS Business Operations Managers. Ms. Rome, in turn, was supervised by Erica Roberts, DNS Commissioner, and Thomas Mishefske, DNS Operations Director. Sha'Nese Burnell Jones was the DNS Personnel Officer generally responsible for Human Resources matters at DNS, and reporting to Commissioner Roberts and Mr. Mishefske.

7.     Ms. Bridges was constructively terminated from her employment by the City on July 22, 2021.

8.     Defendant was, at all material times herein, a municipal corporation doing business in the State of Wisconsin with a principal office address of 200 East Wells Street, Milwaukee, WI 53202.

9.     The City has continuously been and is now doing business in the State of Wisconsin, and has continuously had at least fifteen (15) employees.

## STATEMENT OF CLAIMS

10.     Ms. Bridges suffers from anxiety, stress, depression, panic attacks, high blood pressure,

2

and diabetes, the last two conditions causing her to have increased susceptibility to COVID.

11.     All of these impairments are permanent, physical and mental health conditions that substantially and negatively affect the normal functioning of Ms. Bridges' cognitive, circulatory, and endocrine systems and her ability to, among other things, focus, think, sleep, perform manual tasks or physical activities, and work, constituting "disabilities" under Section 3 of Title I of the ADA, 42 U.S.C. § 12102.

12.     At all relevant times, Ms. Bridges could perform the essential functions of the DNS Administrative Services Supervisor position with or without reasonable accommodations and was a "qualified individual" within the meaning of Section 101(8) of Title I of the ADA, 42 U.S.C. § 12111(8).

13.     As Administrative Services Supervisor, Ms. Bridges was responsible for the management of the DNS Property Registration (Recording) Program. Ms. Bridges supervised a staff of four employees, who processed Property Registration applications, entered property information into the Land Management Systems ("LMS") Database, and assisted customers.

14.     During the last year and a half of her employment with the City (December 2019 – July 2021), Ms. Bridges requested on numerous occasions that the City's Department of Neighborhood Services ("DNS") provide her an accommodation of enclosed office space and part-time telework.

15.     Starting on December 5, 2019, Ms. Bridges' psychotherapist, Krista Getzel,  provided documentation to the City establishing Ms. Bridges' restrictions and indicating that she would require intermittent leave because of mental exhaustion, difficulty concentrating, and mood swings.

16.     As part of this documentation, Ms. Getzel also asked for an accommodation for Ms. Bridges which would permit her to work in an office space with a closed door to allow her to work in quiet and without interruption.

17.     The City initially agreed to this accommodation starting on January 13, 2020, and allowed Ms. Bridges to use a small DNS conference room (room 104) as her office space.

18.     Ms. Bridges requested a meeting with Commissioner Roberts on January 28, 2020. Ms.

Bridges told Commissioner Roberts at that meeting that her ADA accommodations were not ready by January 13, 2020, as they should have been.

19.     Ms. Bridges was supposed to have a medical chair, laptop, and use of the small conference room, as outlined in an email to the City on December 26, 2019.

20.     Ms. Bridges finally received the laptop for the conference room on February 4, 2020, and the chair for the conference room on February 5, 2020.

21.     On February 28, 2020, Ms. Burnell Jones called Ms. Bridges into her office. Ms. Burnell Jones asked Ms. Bridges if Ms. Bridges thought she could do her job. Ms. Bridges said she could.

22.     Ms. Burnell Jones said Tom Mishefske was concerned with her psychotherapist saying she had "mental exhaustion." Ms. Bridges responded that it was not appropriate to single out part of a statement that has supporting medical information. Ms. Burnell Jones then threatened to move Ms. Bridges to a different department.

23.     This meeting between Ms. Bridges and Ms. Burnell Jones occurred after Ms. Burnell Jones already approved Ms. Bridges' initial FMLA request in November and December of 2019. Ms. Burnell Jones was the FMLA Leave Administrator of DNS until the City's Department of Employee Relations ("DER") took over the responsibilities in January 2020.

24.     On March 16, 2020, Ms. Bridges was granted a second accommodation because of her preexisting conditions (diabetes and high blood pressure) which made her contracting COVID more dangerous.

25.     Ms. Bridges provided the necessary medical documentation on March 25, 2020 from her primary care doctor, Dr. Andrew Stollfus, and he requested a work accommodation of telework for her given the COVID threat.

26.     The City permitted Ms. Bridges to work remotely full-time, starting on April 22, 2020, based on COVID issues.

27.     Ms. Rome unilaterally rescinded this remote work accommodation on June 11, 2020,

4

without discussing with Ms. Bridges her ADA accommodation through an interactive process.

28. Ms. Rome sent Ms. Bridges an email requiring her to work in the office three-days a week starting on June 15, 2020.

29. Ms. Rome's email was followed by an email by Ms. Burnell Jones on June 17, 2020, requesting additional documentation for Ms. Bridges' existing accommodation.

30. On June 30, 2020, Dr. Stollfus sent additional documentation, which resulted in Ms. Bridges starting a new accommodation on July 7, 2020, which permitted her to work three days a week in the office (4 hours a day), and two days a week from home (all day).

31. From January 13, 2020 through October 25, 2020, Ms. Bridges, as a reasonable accommodation for her mental health and COVID issues, utilized a small DNS conference room (Room 104) when she was at work and teleworked at other times.

32. On October 26 and 28, 2020, Ms. Rome and Ms. Burnell Jones, unilaterally and apparently with DNS Leadership's blessing, abruptly ended Ms. Bridges' conference room and telework accommodation purportedly to schedule meetings in that conference room and for temporary storage purposes.

33. There is no evidence that the conference room was needed for more meetings or was used in that matter during the time that Ms. Bridges' accommodation was eliminated between November 2, 2020 and March 29, 2021. Moreover, DNS would have been in conflict with CDC guidelines at that time because all in-person meetings had been suspended to avoid the spread of COVID.

34. Any decision to remove Ms. Bridges' accommodation should have been based on an interactive process, as outlined in the City's own ADA policy, with the appropriate forms filled out showing the ADA interactive process had been exhausted.

35. Rather than asking for additional documentation concerning whether Ms. Bridges continued to need an accommodation, Ms. Rome and Ms. Burnell attempted to force Ms. Bridges back

5

to work in-person, full-time without any accommodations by November 2, 2020.

36.     Because of the abrupt withdrawal of Ms. Bridges' accommodation without an interactive process, on October 29, 2020, Ms. Bridges' primary medical provider, Dr. Stollfus, sent a request to the City that Ms. Bridges' accommodation be maintained because of her COVID susceptibility.

37.     Additionally, Ms. Bridges' psychotherapist, Kristen Getzel, requested the same in-office and telework accommodations that she received previously for mental health reasons.

38.     The City ignored both requests and insisted Ms. Bridges return to work full-time without the conference room as an office.

39.     Because of the City's intransigence, Ms. Bridges was forced to take two weeks of FMLA Leave from November 2-November 18, 2020, as Ms. Bridges felt it was unsafe for her to return to work without the confined office space accommodation.

40.     On November 18, 2021, in order to start work November 19, 2021 following her FMLA leave, DNS required Ms. Bridges to submit a Return to Work form, which included a place to inform the City of any restrictions or accommodation requests. However, via phone, Ms. Burnell Jones informed Ms. Bridges that teleworking was no longer allowed specifically for Ms. Bridges and the employees she supervised.

41.     Ms. Burnell Jones also told Ms. Bridges that Ms. Bridges could not come back to the office because she no longer had a safe place to work.

42.     Because of this situation, Ms. Bridges provided additional documentation of her need for an accommodation on December 5, 2020, to Ms. Burnell Jones through Ms. Getzel. The same accommodation, that had been provided in the past, was requested based on Ms. Bridges' mental health and COVID susceptibility.

43.     On December 5, 2020, Ms. Bridges received a call from her psychotherapist, Ms. Getzl. Ms. Getzl stated that Ms. Burnell Jones had called her, but that Ms. Getzl was unable to tell Ms. Burnell Jones anything about Ms. Bridges' condition because of HIPAA privacy protections.

6

44.     Ms. Getzel related to Ms. Bridges that Ms. Burnell Jones told her that DNS did not have a space for Ms. Bridges, and then threatened that if Ms. Getzl kept the accommodation request the same for Ms. Bridges, Ms. Bridges would be placed in the Disabled Employee Placement Program ("DEPP"), or possibly redeployed to the UCC (Unified Call Center).

45.     On December 9, 2020, Ms. Rome, on a teleconference call, told Ms. Bridges that she would not be permitted to telework anymore, and was being forced to return to work full-time without an enclosed office space and without any accommodations.

46.     Ms. Rome, during the same conference call, purported to point to Ms. Bridges' job description as proof that Ms. Bridges was required to be at work physically to do the essential functions of the job.

47.     Yet, nowhere in that job description does it state that the Ms. Bridges needed to be physically present in the workplace. Indeed, Ms. Bridges was permitted to telework for substantial time periods between March 2020 and October 2020.

48.     In the conference call of December 9, 2020, Ms. Burnell Jones also indicated that she did not see how Ms. Bridges could perform her job without the accommodation and that she would need to place Ms. Bridges in DEPP.

49.     Both the placement and referral were premature based on DEPP Policy, which requires an interactive process to have been exhausted before making such a referral.

50.     No such interactive process was followed by the City, let alone to exhaustion as required by the DEPP Policy, as all of its decisions regarding Ms. Bridges' accommodation were made unilaterally.

51.     On December 15, 2020, Ms. Bridges submitted additional documentation from Ms. Getzel again showing her need for the partial telework/enclosed office space restriction for mental health reasons.

52.     On January 14, 2021, Ms. Burnell Jones attempted to have Ms. Bridges sign medical

7

leave-of-absence ("LOA") forms.

53. Ms. Rome and Ms. Burnell Jones forced Ms. Bridges to return City property January 15, 2021, including her laptop, cellphone, and iPad. Ms. Bridges was required to return these items and lose access to all City systems in anticipation of her being placed on involuntary medical LOA effective January 18, 2021.

54. When Ms. Bridges did not sign the medical LOA form because she believed she could still do her job with accommodations, Ms. Burnell Jones and Mr. Mishefske forged the forms on January 25, 2021, backdated to January 18, 2021.

55. Ms. Burnell Jones lied on the medical LOA form, stating that Ms. Bridges was "Unable to sign," which was not true. Ms. Bridges had simply refused to sign.

56. By that same letter on January 25, 2021, Ms. Burnell Jones told Ms. Bridges that she could only stay on medical LOA for 30-days and would be terminated if she did not sign an additional medical LOA form by February 18, 2021. Ms. Bridges again refused to sign.

57. After Ms. Bridges had been out of work since November 2, 2020, the City finally provided two medical questionnaires to Ms. Bridges' attorney on February 19, 2021, to engage in an overdue interactive process to determine whether Ms. Bridges' qualified for her previous accommodation.

58. The City's own ADA policy requires these questionnaires to be sent out as part of the interactive process.

59. Yet, Ms. Bridges' medical providers did not receive this questionnaire prior to February 19, 2021, even though Ms. Bridges first requested an accommodation from the City as early as December 5, 2019.

60. Even though Ms. Bridges provided all the requested ADA medical documentation to the City as of March 23, 2021, in the form of two medical questionnaires from her primary care provider and her psychotherapist, the City only returned Ms. Bridges temporarily to her position with the

8

requested accommodations on March 29, 2021.

61. Ms. Bridges was out of work for *five months without any income* because the City refused unilaterally to continue Ms. Bridges' medically documented need for reasonable accommodations.

62. Ms. Bridges was *not* on FMLA leave during most of this time. Ms. Bridges was only on FMLA leave from November 2, 2020 to November 18, 2020, and then was in limbo while the City considered her accommodation request.

63. Ms. Bridges was then placed involuntarily on a medical LOA without the required signatures on January 18, 2021, and was about to be placed on a second involuntary medical LOA with termination the next step, until her counsel intervened in February 2021 and demanded that the City's ADA Policy be followed.

64. It was not until February 2021, that Ms. Bridges was able to get her past time off recharacterized as FMLA leave by the City's Department of Employee Relations.

65. Six weeks after that, on March 29, 2021, Ms. Bridges was able to return to work with the same, necessary accommodations after going through a tortuous interactive process.

66. Thereafter, DNS leadership continued to badger Ms. Bridges' psychotherapist with questions through additional questionnaires and attempted to undermine her reasonable accommodations.

67. After Ms. Bridges returned to work with accommodations, she performed her position without issue.

68. Nevertheless, DNS leadership continued their retaliatory treatment of Ms. Bridges by holding a pre-disciplinary meeting on May 25, 2021, based on conduct that occurred almost a year previous, allegedly involving one of Ms. Bridges' subordinates.

69. The City utilized this pre-disciplinary meeting to bully Ms. Bridges and threaten her with discipline based on the same pretextual reasons used previously to deny her a reasonable accommodation of telework and enclosed office space.

9

70.     On June 11, 2021, the Department sent Ms. Bridges a medical questionnaire to provide to her medical provider to inquire as to whether or not Ms. Bridges had improved enough to transition into full time work in the office.

71.     On June 25, 2021, the Department received a copy of Ms. Bridges' medical provider's June 22, 2021, response to the medical questionnaire. Ms. Getzel indicated that Ms. Bridges could return to work full time in the office starting on June 28, 2021.

72.     Ms. Getzel indicated that Ms. Bridges would need a work accommodation of an office with a door that closed and that this accommodation request was permanent. Specifically, her medical provider noted, "Ms. Bridges is restricted from working in an open cubicle area where there are distractions and she gets interrupted. She needs a private/quiet office with a door that can close."

73.     As a result of Ms. Getzel's request, the City informed Ms. Bridges that she would be returning to work in-person at the office beginning on June 28, 2021, and that they would temporarily provide her with the conference room as her workspace.

74.     Even so, on July 1, 2021, merely three days later, the City sent a second, harassing medical questionnaire to Ms. Getzel, maintaining it still required additional information. This after almost two-years of similar reasonable accommodation documentation from Ms. Getzel.

75.     As a consequence of the pre-disciplinary meeting, repeated unnecessary medical certification requests, and continual harassment by Ms. Rome, Ms. Bridges was constructively discharged from her employment with the City on July 22, 2021.

76.     After much soul-searching, rather than go through a never-ending biased accommodation process, and continue to endure a toxic workplace led by Ms. Rome, Ms. Bridges left her employment on July 22, 2021, because her workplace had become intolerable and a reasonable person in her same predicament would have also left.

77.     When Ms. Bridges arrived at work on July 22, 2021, and even though the second medical certification from Ms. Getzel was not due until that day, her office belongings had already been removed

from the conference room, indicating that the City had already decided to cancel her enclosed-space accommodation before hearing back from Ms. Getzel.

78.     Because of Ms. Bridges' disability made her incapable of working at DNS without an enclosed-space accommodation, this action was tantamount to constructively discharging her.

79.     The City never engaged in the necessary interactive process with Ms. Bridges once it became aware of her mental health issues on December 5, 2019m and of her increased susceptibility to COVID in March 2020, so that she could be provided with permanent, effective, and reasonable accommodations.

80.     If the City had engaged with Ms. Bridges in the interactive process, she could have pointed out that two of her co-supervisors, Steph O'Connor and Norma Lewis, had voluntarily offered to have Ms. Bridges use their enclosed offices during this time period.

81.     The City did not have legitimate business reasons for eliminating Ms. Bridges' disability accommodation on October 26, 2020, and none of the previous accommodations provided to Ms. Bridges caused an undue hardship to the City.

82.     The City engaged in retaliation against Ms. Bridges for her internal complaints of disability discrimination, by forcing her onto a leave of absence, attempting prematurely to place her in the DEPP, commencing a pre-disciplinary meeting on a pretextual basis, and generally pressuring and harassing her to resign from work.

83.     By abusing the medical certification ADA process for its own ends, and by subjecting Ms. Bridges to intolerable working conditions, the City constructive discharged Ms. Bridges from her employment with the City.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

84.     On January 11, 2021, Ms. Bridges dual-filed a charge of discrimination with the Wisconsin Department of Workforce Development - Equal Rights Division ("ERD"), designated ERD Case No. CR202100054, which was cross-filed with the Equal Employment Opportunity Commission

11

– Milwaukee Area Office ("EEOC"), designated as EEOC Case No. 26G202100235C, alleging, among other things, violations of the ADA for disability discrimination and failure to accommodate by the City.

85.    On December 22, 2021, the ERD issued Ms. Bridges an Initial Determination of "Probable Cause" on ERD Case No. CR202100054, stating that there was probable cause to believe that the City: (1) reasonably refused to accommodate Ms. Bridges' disability; and (2) discriminated against Ms. Bridges in the terms and conditions of her employment; and (3) for retaliating against her for opposing unlawful discrimination in the workplace.

86.    On May 27, 2021, Ms. Bridges dual-filed a second charge of discrimination with the Wisconsin Department of Workforce Development - Equal Rights Division ("ERD"), designated ERD Case No. CR202101204, which was cross-filed with the Equal Employment Opportunity Commission – Milwaukee Area Office ("EEOC"), designated as EEOC Case No. 26G202100611C, alleging, among other things, additional violations of the ADA for disability discrimination, failure to accommodate by the City, and retaliation.

87.    The second charge of discrimination was further amended on September 14, 2022, with additional allegations concerning Ms. Bridges' constructive discharge on July 22, 2021.

88.    On December 14, 2022, the ERD issued Ms. Bridges an Initial Determination of "Probable Cause" on ERD Case No. CR202101204, stating that there was probable cause to believe that  the City: (1) discriminated against Ms. Bridges in terms or conditions of employment because of disability; (2) retaliated against her and discharged her for opposing a discriminatory practice; (3) discriminated against and discharged Ms. Bridges because she made a complaint; and (4) constructively terminated Ms. Bridges based on her disability.

89.    The Department of Justice ("DOJ") issued Ms. Bridges a Notice of Right to Sue on her first charge of discrimination (EEOC Case No. 26G202100235) on May 5, 2023.

90.    The DOJ issued Ms. Bridges a Notice of Right to Sue on her second charge of

discrimination (EEOC Case No. 26G202100611) on July 18, 2023.

91.     Ms. Bridges has exhausted all administrative remedies and filing requirements prior to bringing this action and has filed this Complaint within ninety (90) days of both Right to Sue Letters.

## FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION

92.     Ms. Bridges re-alleges and incorporates the aforementioned paragraphs of this Complaint by reference.

93.     Defendant City has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) of the ADA, 42 U.S.C. § 12111(5), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S. C. § 2000e(g) and (h).

94.     At all relevant times, the City has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

95.     At all relevant times, Ms. Bridges was a qualified individual with a disability within the meaning of Section 101(8) of the ADA, 42 U.S.C. § 12111(8).

96.     The American Disabilities Act of 1990, as amended, makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

97.     Defendant City intentionally discriminated against Ms. Bridges, a qualified individual with a disability, on the basis of her disability in unlawfully altering the terms and conditions of her employment and constructively discharging her from employment, in violation of Title I of the ADA, 42 U.S.C. §§ 12112(a) and (b).

98.     The effect of these practices complained of has been to deprive Ms. Bridges of equal employment opportunities and otherwise adversely affect her status as an employee because of her disabilities in violation of Title I of the ADA, 42 U.S.C. § 12112.

99.     Ms. Bridges' disabilities were the determining factor and/or a motivating factor in

13

Defendant City's decision to unlawfully alter the terms and conditions of her employment and constructively terminate her employment.

100.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with malice or with reckless indifference to the federally protected rights of Ms. Bridges.

101.    As a direct, legal, and proximate result of Defendant City's disability discrimination, Ms. Bridges has suffered damages in the form of lost wages, lost benefits, and compensatory damages, in the form of emotional pain, suffering, loss of enjoyment in life and humiliation, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION – FAILURE TO ACCOMMODATE

102.    Ms. Bridges re-alleges and incorporates the aforementioned paragraphs of this Complaint by reference.

103.    The ADA defines "discrimination against a qualified individual on the basis of disability," as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. 12112(5)(A).

104.    In turn, the term "reasonable accommodation" is defined to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

105.    Defendant City discriminated against Ms. Bridges, a qualified individual with a disability, on the basis of her disabilities when it failed to make reasonable accommodations to her known physical and mental disabilities, through job restructuring, modified work schedules, modification of policies, and other similar accommodations, in violation of Title 1 of the ADA, 42 U.S.C. § 12112(5).

106.    Such reasonable accommodations for Ms. Bridges would not have caused an undue

14

hardship to the City.

107.    The effect of these practices complained of has been to deprive Ms. Bridges of equal employment opportunities and otherwise adversely affect her status as an employee because of her disabilities in violation of Title I of the ADA, 42 U.S.C. § 12112.

108.    Defendant City's unlawful actions were intentional, willful, malicious, and/or done with malice or with reckless indifference to the federally protected rights of Ms. Bridges.

109.    As a direct, legal, and proximate result of failing to reasonably accommodate the known disabilities of Ms. Bridges, she suffered damages in the form of lost wages, lost benefits, and compensatory damages, in the form of emotional pain, suffering, loss of enjoyment in life and humiliation, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION – OPPOSITION RETALIATION

110.    Ms. Bridges re-alleges and incorporates the aforementioned paragraphs of this Complaint by reference.

111.    Section 12203(a) of the ADA, as amended, prohibits employers from discriminating against an employee "because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a).

112.    Defendant City intentionally retaliated against Ms. Bridges for opposing disability discrimination in the workplace by retaliating against her in the terms and conditions of her employment, by forcing her onto a leave of absence, attempting prematurely to place her in DEPP, commencing a pretextual pre-disciplinary meeting, and generally pressuring and harassing her to resign from work, in violation of the ADA, and in reckless indifference to her federally protected rights.

113.    Defendant City, its agents' and/or employees' retaliatory actions would deter a reasonable employee from engaging in protected activity under the ADA.

114.    As a result of Defendant City's unlawful retaliation, Ms. Bridges suffered damages in the form of lost wages, lost benefits, pain and suffering, emotional distress, and other employment

15

benefits, in an amount to be proven at trial.

115. Defendant City's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Bridges' right to be free from retaliation for opposing unlawful disability discrimination in the workplace.

## FOURTH CAUSE OF ACTION – PARTICIPATION RETALIATION

116. Ms. Bridges re-alleges and incorporates the aforementioned paragraphs of this complaint by reference.

117. Section 12203(a) of the ADA, as amended, prohibits employers from discriminating against an employee "because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 2000e-3(a).

118. Defendants intentionally discriminated against Ms. Bridges for filing ERD Case Nos. ERD CR202100054 and CR202101204 by retaliating against her in the terms and conditions of her employment, by forcing her onto a leave of absence, attempting prematurely to place her in DEPP, commencing a pretextual pre-disciplinary meeting, and generally pressuring and harassing her to resign from work, in violation of the ADA, and in reckless indifference to her federally protected rights.

119. Defendants', their agents' and/or employees' retaliatory actions would deter a reasonable employee from engaging in protected activity under Title VII.

120. As a result of Defendant's intentional discrimination and retaliation, Ms. Bridges suffered damages in the form of lost wages, lost benefits, pain and suffering, emotional distress, and other employment benefits, in an amount to be proven at trial.

121. Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Ms. Bridges' right to be free from discrimination based on disability.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Bridges respectfully requests that this Court:

A. Grant a permanent injunction enjoining City, its officers, agents, servants, employees,

attorneys, and all persons in active concert or participation with City, from engaging in any employment practice that violates Title I of the ADA;

B. Order City to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices;

C. Order the City to make Ms. Bridges whole by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, reinstatement or front pay;

D. Order the City to make Ms. Bridges whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above;

E. Order the City to make Ms. Bridges whole by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including but not limited to, emotional pain, suffering, loss of enjoyment in life and humiliation;

F. Order the City to pay Ms. Bridges punitive damages for its intentional, malicious, and reckless conduct, in amounts to be determined at trial;

G. Grant such further relief as the Court deems just and equitable; and

H. Award Ms. Bridges her reasonable attorney's fee, including litigation expenses and costs, pursuant to 42 U.S.C. § 12205.

## **JURY TRIAL DEMAND**

Ms. Bridges demands a jury trial on all questions of fact raised by her Complaint.

Dated this 18th day of July, 2023          Respectfully submitted,

                                           **WALCHESKE & LUZI, LLC**
                                           Counsel for Plaintiff


                                           s/Paul M. Secunda
                                           Paul M. Secunda

WALCHESKE & LUZI, LLC
235 N. Executive Drive, Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
Email: psecunda@walcheskeluzi.com