# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LAKISHA M. BRIDGES,

    **Plaintiff,**

    **v.**　　　　　　　　　　　　　　　　　　　　　**Case No. 23-CV-959-SCD**

CITY OF MILWAUKEE,

    **Defendant.**

## DECISION AND ORDER
## DENYING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

Lakisha Bridges claims that her former employer, the City of Milwaukee, discriminated against her in the terms and conditions of her employment, failed to accommodate her disabilities, intentionally retaliated against her, and constructively discharged her from employment, all in violation of the Americans with Disability Act (ADA). Bridges filed a partial motion for summary judgment, arguing that she has established one claim—the City's failure to accommodate her—as a matter of law. The City maintains that Bridges cannot establish she is a qualified individual under the ADA. As explained herein, a genuine dispute of material fact prevents resolution of this claim. Accordingly, I will deny Bridge's partial motion for summary judgment.

## BACKGROUND

The City provided its own set of proposed additional material facts but did not otherwise respond directly to Bridges' proposed findings of material fact. *See* ECF Nos. 29, 35. Therefore, pursuant to Civil Local Rule 56(b)(4), I will deem Bridges' findings of fact

admitted solely for the purpose of deciding summary judgment. The following facts stem from those uncontroverted statements.

The City employed Bridges as an administrative services supervisor in its Department of Neighborhood Services (DNS) from September 2014 to July 2021. ECF No. 29 ¶ 1. Bridges met the minimum qualifications for the position, including the education and experience requirements, by having more than two years of related experience from her prior job positions with the City, along with some college education and education through additional trainings with the City. *Id.* ¶ 4. Bridges' supervisor did not issue any form of discipline against Bridges from January 2020 through the end of her employment with the City. *Id.* ¶¶ 9–10.

Among other duties, Bridges was responsible for overseeing four clerical positions, which were never fully filled due to ongoing staffing changes. *Id.* ¶ 5. Although the job description for Bridges' position described the essential functions, it did not indicate where those duties must be fulfilled, nor did it otherwise state any requirement that the duties of the position be fulfilled in person. *Id.* ¶ 6.

Bridges suffers from a combination of physical and mental impairments. *Id.* ¶¶ 28–39. On December 5, 2019, Bridges' psychotherapist submitted documentation to the City indicating that Bridges would require intermittent leave due to serious health conditions. *Id.* ¶ 44. The documentation further stated that Bridges would need an accommodation in the form of an office space with a closed door to allow her to work in person and without interruption. *Id.* ¶ 45. In response to the December 2019 accommodation request, the City allowed Bridges to use a small conference room within DNS as her private workspace. *Id.* ¶ 47. In March 2020, Bridges requested a teleworking accommodation because her health condition made her more susceptible to COVID-19. *Id.* ¶ 55. The City approved Bridges for a

2

teleworking accommodation based on disability in April 2020. *Id.* ¶ 61. Eventually, Bridges' supervisor instructed Bridges and her colleague (with whom Bridges shared supervisory duties) to "provide a weekly summary of [their] daily teleworking/in office duties and activities, projects [they were] working on, and the outcomes," and asked them to account for the amount of time spent working. *Id.* ¶ 68. In July 2020, Bridges' work schedule changed from fully remote work to three days in office and two days remote. *Id.* ¶ 62.

On September 14, 2020, Bridges' supervisor (Tanzarla Rome) advised that Bridges' use of the DNS conference room had only been "temporary" and that she would not be permitted to permanently use it as her workspace. *Id.* ¶¶ 9, 74. On October 26, 2020, the Human Resources Administrator (Sha'Nese Burnell Jones) informed Bridges that she needed to "start booking the small conference room" if she wanted to use it and that "we would like you to eventually transition to your regular desk space soon." *Id.* ¶¶ 15, 75. On October 28, 2020, Rome stated that Bridges needed to return to her "normal work area," meaning an open-air cubicle, and that starting on November 2, 2020, she could use the conference room only if: (i) her use was for "meetings with staff, phone calls, etc.," (ii) the room was available and not being used by others, and (iii) she reserved it in advance. *Id.* ¶ 80. Rome also instructed Bridges to return to the office full-time because she could no longer telework. *Id.* ¶ 83.

On October 29, 2020, the City received medical documentation reflecting that Bridges has a medical condition putting her at a higher-than-average risk of complications from COVID-19. *Id.* ¶ 89. Instead of granting Bridges' associated request for a remote or private work accommodation, Rome advised that Bridges and the employees she supervised were no longer allowed to work remotely. *Id.* ¶ 92. Citing potential exposure to COVID-19, Bridges requested medical leave under the FMLA beginning on November 3, 2020. *Id.* ¶ 95. While on

leave, Bridges continued to request accommodation in the form of "an individual enclosed office space for 3 days per week, 4 hours each day, and [to] work the remainder of her 40 hour per week schedule remotely from home." *Id.* ¶ 98. Jones emailed Bridges on December 7, 2020, advising that the City was "unable to accommodate" her teleworking request. *Id.* ¶ 99.

In December 2020, Jones stated that Bridges would have to remain on leave unless her doctor removed the restrictions because the City was unable to meet those accommodations. *Id.* ¶¶ 100, 107. Bridges remained on unpaid leave until March 29, 2021. *Id.* ¶ 112. At that time, the City temporarily returned Bridges to her position with the requested accommodation (partial teleworking and the use of a closed-door, private office) but also requested additional information from Bridges' medical provider regarding her ability to perform the essential functions of her job and indicated that the accommodation's continuation would be contingent on those responses. *Id.* ¶ 138. The record reveals no details about the remainder of Bridges' employment with the City, which ended in July 2021. *Id.* ¶ 1.

In July 2023, Bridges filed a complaint in federal district court against the City, alleging disability discrimination, failure to accommodate, and retaliation, all in violation of the ADA. *See* ECF No. 1. The clerk assigned the matter to Judge Ludwig, who reassigned the case to me after all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 9, 11. Bridges filed a partial motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on October 29, 2024. *See* ECF No. 27. The City filed a brief in opposition, ECF No. 33, and Bridges filed a reply brief, ECF No. 38.

## SUMMARY JUDGMENT STANDARD

4

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for [her] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which [she] believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "However, [my] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [its] favor." *Id.* (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## DISCUSSION

Bridges has moved for summary judgment only with respect to her failure-to-accommodate claim. She argues that the City failed to accommodate her disabilities from November 3, 2020, to March 29, 2021. ECF No. 28 at 27. The City responds that Bridges could not perform the essential functions of her job with her requested accommodation, so she was not a qualified individual whom the City must accommodate under the ADA. ECF No. 33 at 9.

To prove an employer's failure to accommodate, a plaintiff must establish that she is a "qualified individual" with a disability under the ADA. *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). "A 'qualified individual' is one 'who, with or without reasonable accommodation, can perform the essential functions of the employment position.'" *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (quoting 42 U.S.C. § 12111(8)). Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential for any of several reasons, including but not limited to . . . because the reason the position exists is to perform that function" or "because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(2)(i)–(ii).

Courts "usually do not 'second-guess the employer's judgment in describing the essential requirements for the job.'" *Tonyan*, 966 F.3d at 687–88 (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998)). "But this deference is not unqualified." *Id.* at 688. "To determine whether a job function is essential, [courts] look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of

6

those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)); *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001)). Consideration may also be paid to the "consequences of not requiring the incumbent to perform the function." *See* 29 C.F.R. § 1630.2(n)(3).

Here, the City argues that several essential functions of Bridges' role could not be performed with her requested accommodations (either working remotely or on a hybrid schedule combining remote work and private office days). ECF No. 33 at 10–13. Specifically, the City identified "supervisory and liaison tasks that required being in-person, moving through her department, and interacting with staff." *Id.* at 10. Bridges does not dispute the ambiguous responsibilities but contends that the City fails to establish a connection between these tasks and in-person, non-private office work. ECF No. 38 at 4.

Courts have historically assumed that remote work is not a reasonable accommodation, but "technological advances have made working from home more feasible." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023). Now, "[d]etermining whether a specific job has essential functions that require in-person work has become much more of a case-specific inquiry." *Id.* As explained below, the record is not sufficiently clear as to whether the essential functions of Bridges' position could be performed from a remote or private, on-site workspace.

I.    *Alleged Performance Issues*

The City argues that Bridges' job was not suitable for remote work because Bridges did not perform satisfactorily while working remotely or on-site in isolation. ECF No. 33 at 12–13. The City interprets this performance as "a consequence of not requiring [Bridges] to perform the essential job functions in the customary and intended manner, in-person and in

7

communication with her staff." *Id.* at 12. The City did not formally discipline Bridges but alleges several examples of her poor performance: (1) a customer complaint claiming that Bridges and one of Bridges' staff members hung up on the customer's telephone call and gave incorrect information, (2) complaints from newly hired employees that Bridges did not get along with them, was unavailable, and did not provide job training, and (3) an inaccurate report from Bridges that her supervisee was working full-time when the supervisee had not logged into the land management system to perform required work for consecutive days. *Id.* at 6–7. Bridges disputes the foundation, materiality, and relevance of these alleged performance issues. ECF No. 36 ¶¶ 20–23.

Regardless of whether the unsatisfactory performance occurred, the allegations sound in poor individual performance and do not suggest that the shortcomings would necessarily occur due to her working remotely. After all, an employee can undoubtedly find ways to be unavailable to employees, hang up on customers, and fail to provide training even when stationed to work in a traditional office setting. Furthermore, the record is insufficient to establish whether Bridges was incapable of ascertaining her supervisee's failure to log on to the relevant system because Bridges worked remotely, but that inability seems unlikely given that the City permitted the supervisee in question to work remotely. *See id.* ¶ 23. Ultimately, the question is whether the essential functions of Bridges' role *could* be completed with reasonable accommodation, not whether the City was satisfied with Bridges' *actual* performance while working with the requested accommodation. *See* 42 U.S.C. § 12111(8) (describing a "qualified individual" as one who "can" perform the relevant essential functions with or without accommodation).

8

*II.     Other Time Accommodated*

Bridges points out that the City allowed her to work remotely both before and after the time in question. ECF No. 28 at 28. However, the prior time she spent working remotely is not indicative of her ability to perform the essential functions of her job because it occurred during the COVID-19 pandemic. *See* ECF No. 29 ¶¶ 58–61 (explaining that the City approved Bridges' teleworking request after she provided documentation reflecting that she had a medical condition putting her at high risk from COVID-19). And "[t]he fact that many employees were able to work remotely temporarily when forced to do so by a global health crisis does not mean that those jobs do not have essential functions that require in-person work over the medium to long term." *Kinney*, 76 F.4th at 644.

The City did accommodate Bridges with private use of an on-site conference room beginning in December 2019—prior to the period of pandemic-related remote work. *See* ECF No. 29 ¶ 47. This approval certainly suggests that the City believed it was a reasonable accommodation at that time, although the record is vague and does not reflect whether the conference room became Bridges' workstation one hundred percent of the time or still allowed her to take turns supervising employees in the front office with her co-supervisor. *See* ECF No. 29 ¶ 7. After all, Bridges had an open-air cubicle assigned to her when she was responsible for switching off between the front and back offices, and the record is not clear where that cubicle was located. *See id.* ¶¶ 7, 80.

The City also allowed Bridges to work a hybrid schedule involving telework and private in-office days beginning on March 29, 2021. ECF No. 29 ¶ 138. Bridges acknowledges that the City requested additional information from her medical provider at that time regarding her ability to perform the essential functions of her job and that the City indicated the

accommodation's continuation would be contingent on those responses. *Id.* However, the record does not reflect whether Bridges provided that medical documentation or was able to perform the essential functions of her job with the accommodation.

## III. Similarly Situated Employees

Bridges further argues that teleworking must have been an available option because the City allowed other DNS employees to work remotely during the time in question, even without requiring formal accommodation requests. ECF No. 28 at 28. The City's other telework authorizations certainly introduce uncertainty as to why Bridges could not also work remotely. But all Bridges has done is raise uncertainty. Because the record does not reveal what essential functions those jobs entailed, Bridges has not established that the other employees were "similarly situated." *See* 29 C.F.R. § 1630.2(o)(1)(iii) (defining "reasonable accommodation" to include "modifications or adjustments that enable a [disabled employee] to enjoy equal benefits and privileges of employment as are enjoyed by [the employer's] other similarly situated employees without disabilities"). Accordingly, the remote authorizations divulge nothing about the reasonableness of Bridges' specific request to work remotely.

## IV. Co-Supervisory Coverage

Bridges acknowledges that she "performed her supervisory duties through a co-supervising method, as required by the job description, where she and the other supervisor in DNS would switch off as to who was working in the front office (doing direct supervision) versus in the back office." ECF No. 29 ¶ 7. This swapping supervision similarly applied if either supervisor "was on leave or otherwise absent from work." ECF No. 28 at 15. Bridges argues that this model would not interfere with the essential function in question (supervisory

10

duties) because the co-supervisor would be available to directly supervise the employees whenever Bridges was not physically present to do so. *Id.*

As the City points out, this approach directly contradicts the purpose of a reasonable accommodation because Bridges requested an accommodation that would never require her to be physically present in the front office. *See* ECF No. 33 at 10–11. Thus, relying on the co-supervisory model would ostensibly allow Bridges to avoid performing an essential function and leave all supervisory duties to her colleague. *See id.*; *see also Kinney*, 76 F.th at 645–46 (concluding that the plaintiff's requested accommodation (working from home or alone in her office) was not reasonable because her "position required her to play an active role in noticing and addressing issues as a department supervisor"). Ultimately, "[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.'" *Majors v. General Electric Co.*, 714 F.3d 527, 534 (7th Cir. 2013).

Bridges elsewhere suggests that she could perform the "talking" aspect of her job duties via phone calls and virtual meetings. ECF No. 38 at 5. But she does not clearly explain whether the supervisory duties could be swept up in that virtual management. The record does not reveal whether the supervision expected in Bridges' role meant floating around the front office looking over employees' shoulders or whether it could be accomplished, for example, via remote conversations and documentary review. After all, the parties also do not address how the City expected Bridges to supervise the subordinate employee who it permitted to work remotely. *See* ECF No. 33 at 6–7. For these reasons, I find a genuine issue of fact as to whether the essential functions of Bridges' position could be performed from a remote or private, on-site workspace.

*    *    *

In sum, Bridges has failed to present the court with evidence that, if believed by a trier of fact, would establish as a matter of law that the essential functions of her work could be performed remotely or privately. Therefore, her requested accommodation may not have been reasonable. Because Bridges claims that she could not perform her work without that accommodation, and she has not identified any other potentially reasonable accommodations, she has not met her burden of establishing that she was a qualified employee under the ADA. *See Majors*, 714 F.3d at 534 ("[The plaintiff] bears the burden of establishing that she could perform the essential functions of the position with or without reasonable accommodation, and can't meet this burden if the only accommodations suggested were unreasonable."). Ultimately, whether the essential functions of Bridges' position could be performed with her requested accommodation is a question of fact left unresolved by the present record.

**CONCLUSION**

For all the foregoing reasons, the court **DENIES** the plaintiff's partial motion for summary judgment, ECF No. 27. The clerk of court shall schedule a status conference to discuss how the case will proceed from here.

**SO ORDERED** this 11th day of February, 2025.

_____
STEPHEN C. DRIES
United States Magistrate Judge

12